ZAMECNIK, Respondent, vs. ROYAL TRANSIT, INC., and others, Appellants : ALLIS-CHALMERS MANUFACTURING COMPANY, Respondent.
SMITH, Administratrix, Plaintiff, vs. SAME, Appellants : SAME, Respondent.

*September 11—December 2, 1941.*

176

For the appellants there were briefs by *Dougherty, Arnold & Kivett,* attorneys for the Royal Transit, Inc., and the Central Surety & Insurance Corporation, and *Eugene Wengert,* attorney for the Royal Transit, Inc., and oral argument by *Suel O. Arnold, Glenn R. Dougherty,* and *Vernon E. Waters,* all of Milwaukee.

For the respondents there were briefs by *B. F. Saltzstein* and *Gold & McCann,* attorneys for Frank J. Zamecnik, and briefs by *Lines, Spooner & Quarles,* attorneys for the Allis-

Chalmers Manufacturing Company, and oral argument by *Mr. Saltzstein, Mr. Ray T. McCann, Mr. Charles Quarles,* and *Mr. Irving T. Babb,* all of Milwaukee.

The following opinion was filed October 7, 1941:

FRITZ, J.    Frank Zamecnik (plaintiff in Case No. 33) was injured and Warren Shrake (on account of whose death recovery is sought in Case No. 120) was killed at the plant of the Allis-Chalmers Manufacturing Company (hereinafter called "Allis Company") at West Allis, upon being knocked down by a set of three steel plates, which fell off the side of a platform of a truck owned and operated by the Royal Transit, Inc., of Illinois (hereinafter called "Illinois Company"). The truck was loaded under the direction of Myron Kellogg, a truck driver employed by the Illinois Company, at the plant of Scully Steel Products Company in Chicago with some bar steel to be shipped to various destinations in Wisconsin, and also six steel plates ordered by the Allis Company to be delivered at its West Allis plant.    Along the sides of the platform of the truck there were wooden stakes placed in steel stakeholes just inside the edge of the platform, and at each of the outer sides of the platform there were two heavy steel hooks or stirrups hanging down from the platform.    Three of the steel plates, each of which was twelve feet long, ten feet wide, five sixteenths of an inch thick and weighed one thousand seven hundred fifty pounds, were loaded as a set on each side of the truck, by means of a loading crane, so as to stand upright on the metal stirrups hanging below the outer sides of the truck platform and rest against the wooden stakes on the inner side of each set of the plates.    Thereupon Kellogg, to securely fasten the sets of plates, placed two heavy iron hooks on the top of each set of plates near the ends thereof and then attached a long chain to the iron hook, which was on the top near the rear end of the plates on the left side, and ran that chain thence diagonally downward to and through a

stakehole on the right side at the rear end of the platform, and from there forward under and along the platform to and through another stakehole near the front of the right side of the platform, and then above the platform fastened the chain by means of a binder clamp, operated by a lever, to a shorter chain which then extended diagonally upward toward the front end of the set of plates on the left side where it was attached to the iron hook which Kellogg had placed there. The set of plates on the right side was set upright in stirrups and fastened in the same manner. Before finally closing the binder clamp, Kellogg tightened the chains by pulling them together with the binder lever so that there was no slack in the chains, and the tops of the steel plates were sprung inward. When Kellogg in driving to Milwaukee reached a point about halfway he found a discarded iron bedspring along the roadside and placed this spring, which was about six and one-half feet long, as a brace and additional precaution to prevent the tension of the chains from causing the plates to collapse inward, between the sets of steel plates near the rear end and there fastened the spring to the upper part of the set of chains holding the plates in place. Kellogg arrived with the loaded truck at Milwaukee on Saturday afternoon, after the Allis Company's plant had been closed and it was too late to make delivery of the plates. Therefore he drove the truck to the place of business and yard of the defendants in Milwaukee, and it was left there in its loaded condition until the plates could be delivered to the Allis Company on the following Monday morning. Then Julius Schultz, another truck driver employed by the Illinois Company, drove the truck with its original load to the receiving department of the Allis Company plant in the nearby city of West Allis to deliver the steel plates to the consignee. Because of their size, weight, and unwieldy nature, it was necessary, in order to unload them at the Allis Company plant, to attach to each set of the plates the hook of the overhead crane so that they could be lifted

from the truck. Shrake had been directed as an employee of the Allis Company to assist in hooking the crane onto the plates. To do that he had to first place and fasten a heavy C-clamp at the top of each set, and he first attempted to do so on the left-side set while standing on the platform between the two sets of plates. He was unable to reach up to fasten the clamp, and then went to another part of the plant and got a ladder, which he placed on the outside of the left-side set of plates in order to reach to the top of the plates and there fasten a C-clamp.to which there was to be attached a hook that would be attached to a chain leading from the overhead crane. Before Shrake returned with the ladder, Schultz got onto the platform of the truck between the sets of plates and removed the bedspring at the rear end of the truck and then started to get the plates ready for unloading by pulling the lever of a binder clamp and thus loosening the chains, and then taking off the short chains.

On the trial the court found that while Shrake, upon returning with the ladder and placing it on the outer side of the truck on the left-side set of plates so as to lean it against the top of the set of plates on that side and then climbing up the ladder, was standing on it and holding a C-clamp to fasten at the top of the plates, Schultz loosened and disconnected the binder clamps which held the chains together on the truck and thereby removed the only fastenings that were holding the plates in position, and thereupon the plates on the left side suddenly fell outward and upon Shrake, who was instantly killed, and Zamecnik who was badly injured. He was walking on that side of the truck in returning from a toilet to another place in the plant where he was employed as a machinist. The court also found that the usual and customary and only safe way of unloading such plates from trucks when they are loaded in the manner in which they were in this case, was to have the plates firmly attached to an overhead crane prior to the loosening and detaching of the chains holding them in a

position of safety on the truck; that Schultz well knew that such was the customary and only safe way of unloading such plates and that the hazard and danger incidental to any release or loosening of the chains or fastenings holding the steel plates upright and in place, before the plates had been hitched to the overhead crane, was well known to Schultz at the time in question; that the release of the chains by Schultz caused the set of plates on the left side to suddenly fall outward and upon Shrake and Zamecnik; that Schultz, in so loosening the chains and plates prior to the attachment thereto of the crane, should reasonably have anticipated that some injury to another might or would probably result; that Zamecnik's injuries and Shrake's death were caused as a proximate result of negligence on the part of Schultz, in loosening the chains before the plates could be or were attached to the overhead crane, while he was acting as agent of the Illinois Company within the scope and in furtherance of his employment by that defendant; and that neither Shrake nor Zamecnik was guilty of any want of ordinary care on his part which proximately contributed to produce his injuries.

Appellants contend the court erred in finding Zamecnik's injuries and Shrake's death were proximately caused by the negligence of Schultz. Appellants claim that the plates did not fall because of the release of the binder clamp; that no act performed by Schultz caused the plates to fall, but that they fell because of acts of Shrake; that the court's findings are inconsistent with the position of the bedspring on the load, and are contrary to the physical facts and the great weight and clear preponderance of the evidence, and are based on conjecture and speculation. Appellants also contend that the court erred in failing to find that Shrake was guilty of negligence, which caused his death and Zamecnik's injury; and that the finding that Shrake was not guilty of contributory negligence was against the great weight and clear preponder-

ance of the evidence. In this connection appellants claim that Benjamin Goyk, an employee of the Allis Company, had advised Shrake to put a C-clamp on the entire load on one side and not to unloosen the chains until the crane was attached to the load, and to tell Schultz not to unloosen the chains, but that Shrake failed to inform Schultz not to remove the chains; that, in order to make the necessary preparations for unloading, it was not necessary for Shrake to stand under the plates or on a ladder at the outside of the plates because, when he first got on the truck platform to fasten the C-clamp on the plates, he could have placed it on top of the plates with the bolt on the inside instead of the outside, and then could have tightened the bolt while on the inside of the plates; and that he was guilty of negligence in standing on the ladder with a heavy C-clamp in his hands.

None of these contentions can be sustained. The proofs clearly establish that Schultz well knew, as the court found, that the usual and customary and only safe way of unloading such plates from trucks when loaded as they were, was to have the plates firmly attached to an overhead crane prior to the loosening and detaching of the chains that were holding them in a position of safety on the truck; and likewise establish that immediately upon the unfastening and removal of the short-length chains by Schultz the plates, which had been sprung inward at the top and were being held in place by the chains bound together by the binder clamp, swayed and the left-side set fell outward. As Schultz well knew the danger incidental to such loosening of the chains before the plates were hitched to the overhead crane, the record well warranted holding that Schultz was negligent in loosening the chains at the time and in the manner in which he did, and that such negligent conduct on his part clearly constitutes the cause of the fall of the plates and the resulting injury to Zamecnik and Shrake. Under the circumstances a mere omission on the

part of Shrake to inform Schultz not to loosen the chains, which the latter well knew should not be done, cannot be considered the cause of the accident.

On the other hand, the evidence did not establish so conclusively as not to admit of the court finding to the contrary, that Shrake was negligent in failing to fasten the C-clamp from the inside of the plates, or that he placed the ladder against the outside of the plates after he ought to have known that the short-length front chains had been removed; or that there was any negligence on his part in that respect or in standing on the ladder to fasten the C-clamp on top of the plates. But even if the evidence had admitted of so finding and the court had so found, it would not follow that negligence found in any of those respects constituted a cause of the plates falling outward. On the contrary, even if Shrake could have fastened the C-clamp from the inside, neither his failure to do so nor his placing of the ladder leaning against the outside of the left set of plates can be held to be a cause of the left-side set of plates falling outward. The ladder leaning inward against the outside of that set of plates and Shrake's weight, while standing on the ladder, necessarily tended rather to press the top of the plates inward and to thus retard their falling outward, instead of causing them to fall in that direction; and as it seems improbable that they could have fallen that way if Schultz had not released the chains before the plates were attached to the crane, his negligence in this respect can well be considered the sole cause of the accident, as was found by the court.

Appellants further contend Zamecnik was guilty of contributory negligence in that he was not walking between marked safety lines in returning from a toilet room to his place of work, and that at the time of the accident he was stopping, as a matter of curiosity, to look at the loaded truck; and that his conduct in thus satisfying his curiosity was a proximate cause of his injury. It appears from the record that the evi-

dence admitted finding that Zamecnik, in returning to his place of work, was walking in an aisle designated by red lines as a place that was to be kept clear for walking purposes; that as he was proceeding between these safety lines toward the parked truck he saw the ladder leaning against the plates and when he was about even with the front end of the truck he saw also Benjamin Goyk, who was then about seventy-five to one hundred feet east of the truck and looking toward the right side thereof, "hollering" and waving his arms, but that Zamecnik did not know at whom Goyk was waving or of any impending danger; but that as Zamecnik looked up and saw the plates tipping over and the man and the clamp coming toward him, he put his hands over his head to try to get away, but was struck down by the falling plates.

In view of these facts there does not appear to have been any failure on the part of Zamecnik to exercise ordinary care, and it was within the province of the court to find that he was not guilty of contributory negligence. It follows that the court did not err in concluding that the proximate cause of Zamecnik's injuries and Shrake's death was Schultz's negligence in loosening the chains before the plates were attached to the overhead crane; and that neither Zamecnik nor Shrake was guilty of any negligence which proximately contributed to produce his injury.

Appellants contend further that the court erred in finding and concluding that Schultz, in driving the loaded truck to the Allis Company plant and in preparing for the unloading of the plates, was acting as an employee of the Illinois Company, and that therefore the injuries and the death in question were caused by the negligence of that corporation. These findings and conclusions were warranted by the stipulation that the truck was owned by the Illinois Company, and by the evidence which established that the control and operation thereof in making the trip from where it had been left in Milwaukee on Saturday afternoon to the Allis Company plant,

in order to there complete the transportation and delivery of the plates by the carrier, which included the preparation necessary on the truck in order to unload them, continued in Schultz as an employee of the Illinois Company, acting within the scope and in furtherance of his employment by that corporation. Whatever arrangements there may have been between the Illinois Company and the Royal Transit, Inc., of Wisconsin in relation to the division between them of the amount to be received for the transportation services, whether interstate or intrastate, and in relation to their respective duties or obligations in that connection is immaterial in this action in so far as Zamecnik and the Allis Company are concerned. The facts that the truck in question was the property of the Illinois Company and that the control and operation, including the preparation for the unloading thereof, was vested by that corporation in its employee, Schultz, for the purposes which he was engaged in furthering at the time of his negligence which caused the accident, sufficed to render the Illinois Company liable for damages caused thereby.

Appellants also contend that the assessment of Zamecnik's damages at $62,500 is excessive. At the time of his injury on July 19, 1937, he was forty-six years of age and earning $39 a week. He sustained a badly compressed fracture of the tenth dorsal vertebra and the posterior dislocation of the tenth, eleventh, and twelfth dorsal vertebrae. The effect thereof was to completely sever the spinal cord, complete motory and sensory paralysis below the point of the break and the dislocation of fragments on the tenth dorsal vertebra. There was also a posterior dislocation of the tenth, eleventh, and twelfth dorsal vertebrae, and he cannot feel sense of touch below that point. As a consequence he has no control of his bowels or active urination. In order to urinate, it has been necessary to catheterize him four times each day and once at night, and the bowels are cared for by giving him castor oil every second day. His condition is permanent, and there is

nothing known to medical science to improve the present condition. He cannot be treated adequately at home, and will require hospitalization throughout the remainder of his life, because the catheterization requires trained help and proper equipment. Nursing care is necessary to keep him in a state of health, and the doctor has called upon him daily since the accident. The first six months he was in a cast, and after that was removed he was allowed up at short intervals, but ulcers formed on the buttocks in June, 1939. Since then, that necessitated his staying in bed because there was too much pressure while he was sitting in the chair and he ran a low-grade temperature; and he has been up just occasionally. The first two months he suffered very excruciating and continuing pains, and since then he has had and will continue to suffer physical and mental pain and humiliation as the result of the injury; and he will continue to be incapable of earning anything. ' Up to the time of the trial in January, 1941, his wage loss and the cash expenditures for hospital, physician's, and nurse's charges were approximately $21,000. There was proof that his loss of wage, based on the lower rate which prevailed in 1937, will probably be approximately $2,000 annually, and that, in addition, his expenses for hospital, physician's, and nurse's charges will be approximately $3,625 annually. He had an expectancy, according to the American Experience Table of Mortality, of 23.81 years, and there is credible testimony that with a continuation of good nursing he can expect to live as long as the average man. In view of the proof as to the very serious nature and consequences of the injury, as to which there is but little dispute, the award of damages cannot be held to be excessive. With the loss of wages and expenditures amounting to approximately $21,000 up to the time of the trial, and approximately $5,625 annually thereafter, plaintiff's damages will obviously exceed, without taking into consideration any allowance for pain and suffering and humiliation, etc., the award of $62,500, if it is assumed

188

that he could be expected to live but eight years after the trial, instead of the period of his expectancy according to the American Experience Table of Mortality.

It follows that the judgments under review must be affirmed. *By the Court.*—Judgments affirmed.

A motion for a rehearing was denied, with $25 costs in one case, on December 2, 1941.