## MARINO v. UNITED STATES.

Civ. A. No. 8065.

United States District Court
E. D. New York.
June 22, 1949.

Joseph H. Wackerman, Brooklyn, N. Y., for plaintiff.

J. Vincent Keogh, U. S. Atty., Brooklyn, N. Y. (Frank J. Parker, Chief Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for defendant.

BYERS, District Judge.

This is a personal injury cause instituted under Title 28 U.S.C.A. § 1346(b), Federal Tort Claims Act, and the procedure is regulated by Sections 2671–2679.

The plaintiff was seriously injured, suffering second and third degree extensive burns, while operating a tractor at Mitchell Field on October 29, 1946, at 3:59 P.M. His vehicle was struck by the wing of a P-51 fighter type airplane which was moving east on a taxiway, having turned into it from the runway which lies more than 1,000 feet to the west of the place of collision.

Because of its high riding nose when the plane is proceeding on the ground, the pilot was unable to see straight ahead, and consequently had to zigzag in order to observe conditions on the taxiway as he proceeded to his destination, which was one of the several hangars to the east of Butler Hangar shown on Defendant's Exhibit A. That is, when moving to the right he looked out to his left, and vice versa. He had an angle of vision of 45°, being the two center sectors of the 90° arc of a quadrant resulting from the right angle formed by a line drawn straight ahead, and one drawn abeam.

This maneuver is called "essing", and for present purposes means that the plane crossed the 160-foot concrete strip from right to left and back again during the forward movement. The wing-tip spread is 35 feet, so that the successive turns were made within the limits of about 125 feet in order to preserve a course within the limits of the taxiway. Since the respective headings to left and right were necessarily diagonal to an imaginary center line of the taxiway, it is impossible to state just what area would be included in this restricted range of vision at a given instant.

The pilot testified that he was proceeding at 1,000 R.M. of the propeller, giving him an estimated ground speed of 15 to 20 M.P.H., and passing the control tower situated at about the southwest corner of the Butler Hangar, he went into or was in a right ess, giving him a lookout to his left or northeast.

At a little east of Butler Hangar, he started to his left, and was recovering from that (i. e., starting to his right) when his left wing, at about 4 feet from its end, struck the tractor, and thus caused the accident. He shut off his engines and in 3 or 4 seconds came to a stop. He climbed out of his plane and found the plaintiff on the tractor, under the engines of the plane. Gasoline in the tractor's tank at once ignited and before the plaintiff could be lifted clear, he suffered severe burns to both legs, left arm, shoulder, ear and his neck, being the injuries for which he seeks recovery.

It should be said that hospitalization was required until June 26, 1947, during which period he had numerous skin grafts which

were painful in the extreme; he suffered a foot-drop, necessitating the wearing of a brace on the right foot. The skin grafting could not be accomplished until the necrotic areas had been cut out, and this form of surgery was performed about 16 times in all, in connection with which blood transfusions were required.

Since his discharge from the hospital, the plaintiff has undergone diathermy and other physical therapy. As to one skin graft at least there is a fixation of scar tissue to a heel tendon, and the heel-drop may recur. In the scar tissue areas there will be a greater susceptibility to incidence of tumor growth than would be true in the presence of normal tissue and skin.

Since June of 1948, the plaintiff has been able to resume work as a truck driver.

The questions presented are:

■ 1. *Contributory negligence*: If that were shown, the plaintiff's cause would be defeated, since the New York law is to that effect, which would govern under the terms of the statute.

■ As to this, of course the burden of proof would be with the defendant under recognized principles, and its evidence is entirely negative, since none of its witnesses professes to have seen the tractor, until the actual happening.

Reliance seems to be had upon the plaintiff's testimony under cross-examination, but that will be found to be of no avail on that issue. The tractor was used to plow out and loosen the seams between the concrete slabs (10 x 20) which constituted the surface of the taxiway. Once those seams or joints had been cleared of the old sealing mixture, a new hot tar preparation was poured into the open seams by those in charge of a truck which followed behind the tractor.

Removal of the worn or disintegrated filler was accomplished by letting down into a seam or joint, so to be treated, a spike which was rigged on the tractor. Then the latter moved ahead and the spike routed out the filler to be removed. This was not always so accomplished as to leave clean-cut sides, and the plaintiff's helper sometimes walked ahead of the tractor to fix the spike in place, and when that was done, he followed behind to clean out as needed the joint which was about to be filled from the truck which carried the new filler.

■ If it is argued as it seems to be, that this helper should have been on hand and not allowed to leave to get a drink of water (as the evidence showed he did), and that thus contributory negligence is shown, I cannot agree.

He was not a lookout for the plaintiff. He was an assistant to insure completion of the task of the tractor. If he had been poising the spike at the moment of approach of the P-51, he might have seen it and warned the plaintiff to jump, but again he might not have understood the expectable course of the plane any more than did the plaintiff, even if he had seen it. But his job was to look down, not up.

As to the plaintiff's conduct, his testimony may be thus paraphrased: He had been instructed to watch the tower constantly for signals when planes were moving on the taxiway, and at the flash of a red light he was to promptly move to a safe place.

This he clearly understood during the 5 days that he had been working on this job.

Early in this afternoon he was operating his tractor south and east of Butler Hangar and therefore of the control tower, in the open space adjacent to the several hangars, and on the taxiway, all shown on Exhibit A. There were one or more planes in front of or near the hangars, at rest.

Just before the P-51 put in an appearance, two planes moved east on the taxiway, in the southerly half, parallel to where the plaintiff was working. They moved straight, i. e., no "essing" was necessary since their bodies were not of the same shape as the P-51. It is true that he received neither a green nor a red light from the control tower as to either of these. That could have taught him (a) that the tower men were not watching his tractor, or perhaps could not see him because he was too close to the Butler Hangar to be within their line of sight, or (b) that they

did not consider his then position to be dangerous as to either plane.

I do not .see how he can be charged with neglect for having failed to do anything in face of the absence of signals. He could scarcely be expected to stop his work and inquire of Army personnel as to why they failed to flash any light.

When the second plane passed safely, he started "pumping down the point", i. e., forcing it into a seam or joint. Then he glanced up and saw the P-51 about at the Butler Hangar, apparently going straight along the southerly side. (That would be possible between swings for an instant or two.) The P-51 started to veer to the left; plaintiff looked up toward the tower, received no signal, and in a few seconds brought his eyes down, and saw the propeller of the plane as it was coming toward him, but how far away he couldn't say. He threw the tractor in reverse at a slight angle to the north (his right); then the plane hit before he could leave the tractor. He cannot say how far the latter moved under the reverse, plus the impact.

He threw himself between the high sidewheel of the tractor and its body, and the left wing of the plane swerved on the tractor, and the plane rode over the latter, which broke into flames, causing him to be covered with fire.

The Government argues that since Marino had gotten out of the way of an approaching plane which he observed during the morning's work of this day, without receiving a red signal flash from the tower, it is evident that he knew his duty under such circumstances, and it was negligent for him not to do the same thing in this instance. The testimony is clear that Marino knew that he had to take protective action in the exposed place where he was operating, even in the absence of a danger signal from the tower.

So much being granted, it is necessary to consider his observation of the two planes that passed him as has been related, and his preoccupation with the task that he was performing. As related above, he was resuming the operation of the tractor, and had put the spike or point down to proceed west. He had to look at the seam in order to place the point properly. On observing the veering to its own left of the P-51, he raised the point and started to back away. Perhaps he should have elected to abandon his tractor and doubtless would have, if he had sensed that a striking would be inevitable, but the choice he made seemed to be the proper one at the time, and I can see no reason for holding that a possible error in judgment, as later events turned out, could properly be characterized as negligence. I think he did what could reasonably be expected of him under the circumstances, and accordingly I find that he was not negligent.

2. *Defendant's negligence*: It is necessary in this connection to place the approximate position of the tractor at the time of the impact. This cannot be done with precision because no one knows exactly, since the observations and records made after the event are subject to an allowance for the movement of both vehicles as the result of the striking.

Concededly the tractor was working near the north edge of the taxiway in a position not less than 220 feet, nor more than 325 feet, easterly from an imaginary line in prolongation of the easterly face of Butler Hanger drawn southerly across the taxiway.

The minimum distance above stated is the Government's assertion which is urged to vindicate the theory that the tractor, as Marino was operating it, was too close to Butler Hangar to be visible to those in the control room of the tower which has been mentioned.

I find the maximum and minimum distances to have been as stated, with the tractor close to the northerly edge, i. e., about 8 feet, since the width of a cement slab is 10 feet and the tractor was straddling an east and west seam, or joint, into which he was "pumping down the point", while headed west.

It is further found that the operating crew in the tower did not see the tractor just before the plane struck it, nor did any officer who testified on the subject. The evidence is regarded as too theoretical to

justify a finding as to whether a person of normal height, looking in the direction involved, could have seen it.

It is further established by the evidence, namely, the testimony of Capt. Mitchell, Flying Officer, U. S. A., Staff Sergeant Hastie, and Sergeant Schroeder, that the accident to the plaintiff was due to the negligence of the defendant, in that:

It was the duty of the men in the tower to inform themselves of the presence of this tractor on the taxiway, namely, its position just prior to the accident, and not to give clearance to the P-51 to proceed along the taxiway from the runway lying to the west, until the taxiway was known to be clear. It is unnecessary to discuss whether these duties were primarily for the protection of pilots and planes, or of civilian workers and equipment. The duties existed and were owed in part to the plaintiff, and were not performed.

Sergeant Hastie knew that the work of clearing and resealing the joints was going forward, and that complaints had been made that signals from the tower had not been obeyed by those so employed, prior to this accident. He says it was the duty of Operations (a division of the Air Service) to know that these men were working to the east of the control tower. He it was who told the pilot that he had permission to proceed along the taxiway from its intersection with the runway, but did not warn him of the presence of the tractor. He did not flash the red light to the tractor (nor did any one else) after clearing the P-51 as stated. No service man was stationed east of Butler Hanger to warn trucks or tractors of planes approaching on the taxiway, although there is a blind spot on the latter, an area hidden from view in the tower by the presence of that portion of the Butler Hanger roof which projects east of the tower for about 150 feet.

The complaints which this witness had made to Base Operations, concerning the apparent neglect of tower signals by the tractor and truck, should have taught someone the necessity for taking extra precautions with particular reference to the work going forward in the area of the said blind spot.

Sergeant Schroeder is quite sure that a notice was posted that morning on the bulletin board in the tower, to the effect that men (civilians) were working on the taxiway; and also he observed the cleaning of these joints east and southeast of the Butler Hanger. He says it was part of the duty of the tower detail to know whether men were working on the taxiway, in order to give clearance to planes desiring to proceed thereon, but that no one had been stationed so as to signal to the tower concerning the possible presence of men working in the blind spot or area.

It would be reasonable to ascribe negligence also to the pilot of the P-51, if the testimony were positive to the effect that he had been informed of the presence of the tractor on the taxiway, but Sergeant Schroeder is able to state only a belief that the caution had been given.

Major Robinson, the pilot, testified that he knew that joints in the taxiway were being repaired, but that was a general statement; also that as he moved easterly he did not see the truck, nor Fowler (who was superintendent of this job), standing a little to the west of the tower, on the taxiway. That lack of observation would be consistent with a failure of the tower to warn him to be on the lookout for the men who were doing this job.

Because of the restricted area of his vision, he could not be held to have been negligent in failing to see the plaintiff, in the absence of such a special warning from the tower.

It has not been overlooked that the control tower was a busy place, and that other planes than the P-51 had to be advised in making landings, but the repairs to the surface of this runway were important enough to the Air Service to call for the exercise of reasonable care to guard against such an accident as took place, and it is my considered view that such reasonable care was not exercised, and that the plaintiff is entitled to recover his damages.

An award commensurate with the plaintiff's injuries must embrace his loss of earn-

ings amounting to $4,620.00 (82½ weeks) and the hospital and medical expenses for which he was primarily responsible, although seemingly paid for by a third person or company, amounting to the stipulated fair and reasonable value of $5,029.62, plus an award for pain and suffering which must have been intense.

It is not to be supposed that the plaintiff will necessarily incur further medical expense in connection with his injuries, but the possibility that such a result may follow enters into the computation which I have made, that the plaintiff should recover judgment against the defendant in the sum of Twenty Thousand Dollars ($20,-000.00); it is suggested that suitable provision be included therein to reimburse the item of medical and hospital expenses incurred, to the agency advancing the same. Pursuant to Title 28 U.S.C.A § 2678, the fees of the plaintiff's attorney are fixed at 20% of the amount that goes to him (i. e., $20,000.00 less $5,029.62) or $14,970.38.

Judgment is directed accordingly.