234 F.Supp. 499 (1964)
Mary Ann Sigmund Miller WENNINGER, widow of William W. Miller and co-administratrix of the Estate of William W. Miller, and Lindley C. Miller, co-administrator of the Estate of William W. Miller, Plaintiffs,
v.
UNITED STATES of America, Defendant.
Civ. A. No. 2207.
United States District Court D. Delaware.
September 14, 1964.
*500 Edmund N. Carpenter, II, and E. Norman Veasey, of Richards, Layton & Finger, Wilmington, Del., for plaintiffs.
Stanley C. Lowicki, Asst. U. S. Atty., Wilmington, Del., and Philip Silverman, Trial Atty. Dept. of Justice, George H. Foster, Jr., Federal Aviation Agency, and George H. Gibbons, Lieutenant-Colonel, Judge Advocate General's Office, *501 Tax and Litigation Div., Washington, D. C., for defendant.
STEEL, District Judge:
Plaintiffs, the widow and co-administrators of the estate of decedent, William W. Miller, have sued the United States for damages for decedent's death and the destruction of an aircraft which he owned. Decedent was killed and his Piper Tri-Pacer was demolished on September 23, 1958, at approximately 2:00 P.M. when an inflight failure occurred to the Tri-Pacer while being operated by decedent at a point several miles north of the Dover, Delaware Air Force Base.
Plaintiffs contend that the failure of the Tri-Pacer was due to its encountering vortex turbulence generated by a C-124 owned by the United States, which was being operated in connection with the Dover Air Force Base. Plaintiffs assert that in 1958 C-124s from the Dover Base had been crossing Airway Victor 16 from all directions in the vicinity of the Kenton VOR in connection with their use of the VOR as a navigational aid, for extensive practice and actual instrument approaches, for holding patterns, and for instrument training by "tracking" in on the VOR. These actions, plaintiffs assert, exposed other users of the air space, including decedent, to an unreasonable risk of harm. Plaintiffs claim that the Commander of the Dover Air Force Base was negligent in permitting the C-124s to engage in these activities, and that both the Commander and the Civil Aeronautics Authority (CAA)[1] were negligent in failing to warn civilian flyers of such activities, either by the issuance of a NOTAM ("notice to airmen"), the standard method of warning pilots of unusual flight hazards, or in some other appropriate manner. These acts of negligence are alleged to have been the proximate causes of the accident. Plaintiffs also assert that the accident was caused by the negligent operation of the C-124 by its pilot.
Defendant denies that the proof is sufficient to establish that vortex turbulence caused the accident, asserts that if it is, the proof is inadequate to establish that it was generated by a Government airplane, and that in any event, negligence on the part of the Government and its causal relationship to the accident have not been proven. Additionally, defendant contends that if its negligence was a proximate cause of the accident, plaintiffs cannot recover because decedent was contributorily negligent. Finally, the defendant argues that the activities which plaintiffs claim constituted negligence on the part of the Commander and the CAA, were either matters of discretionary judgment or constituted misrepresentations that Victor 16 was safe when in fact it was not, and that 28 U.S. C. § 2680(a) and (h) deprive the Court of jurisdiction. Defendant admits, implicitly at least, that jurisdiction exists, insofar as plaintiffs' cause of action is based upon the negligence of the Government pilot.[2]
The law of Delaware governs the substantive rights of the parties. Where there is no Delaware decision in point or suggestive of the answer to a particular problem, what appears to be the soundest view ascertainable from all relevant authorities will be adopted as indicative of what the Delaware law would be if the issue had come before its Courts. See Wright on Federal Courts, § 58, pp. 205-206.
Plaintiffs have the burden of establishing that the accident was proximately caused by the negligence of the defendant, and defendant has the burden *502 of proving that the negligence of the decedent was a proximate cause of the accident.
The evidence is largely circumstantial, and it is impossible to resolve with certainty many of the important fact issues. It is not necessary, however, for the parties to eliminate every conclusion other than the ones which they espouse. It will be enough if they establish by a preponderance of the evidence as a whole that their contentions are in all probability correct. See Noel v. United Aircraft Corporation, 219 F. Supp. 556 (D.Del.1963).

BACKGROUND FACTS
Decedent's aircraft was a light, single-engine fixed wing aircraft with a maximum allowable gross weight of 2000 pounds and a maximum cruising speed of 135 miles per hour.
On September 23, 1958, the Dover Air Force Base was owned and operated by the United States principally as a base for the Military Air Transport Service. It was the headquarters for the 1607th Air Transport Wing (H). The Wing included Transport, Maintenance and Air Base Groups. The Transport Group was composed of six Squadrons. All of the Squadrons, with one exception, were assigned to fly the C-124 type aircraft. The other was assigned to fly the C-133 type aircraft.
On September 23, 1958, the C-124 type aircraft at the Dover Air Force Base was a four-engine military transport, with a wing span of approximately 174 feet, a length of approximately 130 feet, and a height of approximately 48 feet. The C-124 had a minimum empty (without cargo and only minimum fuel load) gross weight of approximately 110,000 pounds. The maximum take-off gross weight, fully loaded with fuel and cargo, was approximately 195,000 pounds.
On September 23, 1958, the weather at the Dover Air Force Base at 1300 EST on the surface was clear, visibility 15 miles, surface winds west at 4 knots. At 1400 EST the surface observation indicated high, thin, scattered clouds, visibility 15 miles, surface winds west-northwest at 6 knots. Winds aloft were light and variable below 2000 feet MSL. The winds at 1000 feet MSL would have been approximately 050°, 10 knots.
At the time of the accident, decedent was operating his aircraft under VFR (visual flight rules) as he was entitled to do under the conditions which prevailed.
At the time of the accident, decedent was on a flight from Zahn's Airport, Amityville, New York, to Charlottesville, Virginia. He was flying Victor 16 and using as a navigational aid a radio beam transmitted from the Kenton VOR (visual omni range) located about seven miles north of Dover in the center line of Victor 16.
Victor airways were established by the CAA and are based upon very high frequency navigational aids called VOR stations or VHF omni directional radio range stations. VOR stations which facilitate navigation on Victor airways are located on the ground at various points along the center line of Victor airways.
A VOR serves as a reference point for an airplane trying to get to an airport in the vicinity of the VOR as well as a navigational aid to airplanes en route to another destination.
Victor 16 is the standard route for northeast-southwest bound traffic. On September 23, 1958, Victor 16 was one of the major traveled routes to the southwest. The actual crash site was about 1 4/10 miles south of the Kenton VOR.

JURISDICTION
Jurisdiction exists under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) unless, as defendant argues, it is excluded by 28 U.S.C. § 2680. The latter provides that the provisions of § 1346(b) shall not apply to,
"(a) Any claim based upon * * * the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee *503 of the Government, whether or not the discretion involved be abused.
* * * * * *
"(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."
Whether the Court has jurisdiction to entertain the action depends upon the meaning of these two provisions.

Section 2680(a)
Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) delineates in general terms the type of discretion which, if abused or negligently exercised will, and the type which will not, support an action against the Government in the federal court. The discretion protected, the Court said, is that of "the executive or the administrator to act according to [his] judgment of the best course, * * *". 346 U.S. at 34, 73 S.Ct. at 967. The protected discretion (pp. 35-36, 73 S.Ct. p. 968):
"includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion." id at 35-36, 73 S.Ct. at 968.
On the other hand, when discretion at the "operational level" is abused or negligently exercised, it is not protected by § 2680(a). id at 42, 73 S.Ct. 956. Thus, Dalehite is said to have established "planning-operational" distinction. Mahler v. United States, 306 F.2d 713, 723 (3rd Cir. 1962), cert. denied, 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962).
In many cases, the line of demarcation between discretionary acts which are actionable and those which are not, is difficult to draw. Here, it is clear that, but for the terms of the Air Force Regulations hereinafter discussed, the Commander of the Air Base would have been exercising a discretion in the planning area when he determined the manner, extent, and time when the Dover-based pilots should use the Kenton VOR. In United Air Lines, Inc. v. Wiener, et al, 335 F.2d 379 (9th Cir. June 21, 1964), it was stated as a general proposition that "instrument approach training is an Air Force activity initiated at the planning level of the Air Force." The Court held, however, that AFR 55-19, par. 1a., 2b., and 5a. prescribed the duties of an Air Force Commander in prescribing the conditions for local flying, and hence if any of those duties were breached, the action of the Commander could not be considered a discretionary decision within the § 2680(a) exemption. Since in the case at bar plaintiffs claim that AFR 55-19, par. 1a. and 5a. (as well as 1b.) were breached, the Court, under the rationale of United Airlines v. Wiener, is not deprived of jurisdiction by § 2680(a), insofar as recovery is sought based upon the alleged negligence of the Commander in scheduling flight activities over the Kenton VOR. This is so regardless of whether the regulations were in fact breached, for the claim is obviously one made in good faith.
The decisions of the Commander and the CAA not to issue NOTAMs, another basis for plaintiffs' claim of negligence, were exercises of discretion at the operational level.
At the time of the accident, the CAA had a duty under the Civil Aeronautics Act of 1938 (now repealed) to "* * * promote safety of flight * * * by prescribing * * * [a]ir traffic rules * * *", 49 U.S.C. § 551(a) (7).[3] The CAA had the power to enact regulations governing the issuing of NOTAMs. Although at the time of the accident the CAA had issued NOTAMs, it had not promulgated regulations governing their issuance. Its determination to issue or *504 withhold a NOTAM rested upon its view as to the need therefor in each case and was not referable to any formulated criteria.
The general determination of the CAA that NOTAMs should be issued to warn of flying hazards was the exercise of an executive or administrative discretion on a policy level, and fell within the protection of § 2680(a). But once the CAA decided that it would be appropriate to issue NOTAMs, its determination that a NOTAM should or should not be issued in a particular case was a discretionary decision at the operational level and beyond the jurisdictional exceptions of § 2680(a). Compare Indian Towing Co. Inc. v. United States, 350 U. S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955).
The Government would have the Court reach a contrary conclusion primarily upon the basis of 49 U.S.C. § 551(a)( 6). This conferred upon the Civil Aeronautics Board the power to prescribe such "rules and regulations, or minimum standards * * * as the Board may find necessary * * * for safety in air commerce."[4] By 49 U.S.C. § 551 (c)[5] the CAB was authorized to delegate its rule making power to the Administrator of the CAA. It is argued that by authorizing the Board to prescribe such "rules and regulations" as it might "find necessary" and to delegate that power to the Administrator of the CAA, the judgment of the CAA in issuing NOTAMs was discretionary. The short answer is that the CAA had promulgated no "rules or regulations" pertaining to NOTAMs prior to the accident. It was not until the latter part of 1958 that the CAA attempted to develop standards for their issuance.
The Commanders of Air Bases also had the power to issue NOTAMs, and in many instances had done so before the time of the accident. Their decisions to issue or withhold the issuance of NOTAMs in a given case involved no broad administrative or executive policies but was the exercise of a discretion of an operational kind.
The Government points to AFR 55-19, par. 1(b),[6] which provided that the Commander of an Air Base "when necessary" shall issue appropriate NOTAMs announcing that extensive training is being carried on and that pilots entering the area must use extreme caution. The words "when necessary", the Government urges, are words of discretion. This is true. But it does not follow that the discretion was of the "planning" type involving broad questions of policy which Section 2680(a) was intended to cover. If the Commander had established standards prescribing the circumstances when NOTAMs should issue, his act in so doing probably would have been protected by § 2680(a). But he had not done so.
The Court is not deprived of jurisdiction by § 2680(a) insofar as plaintiffs' claim is based upon the alleged negligence of the CAA and the Commander in failing to issue a NOTAM or other *505 warning of the hazards which existed in and about the Kenton VOR.
The Government has properly conceded that § 2680(a) affords it no protection against plaintiffs' claim that the pilot of the C-124 was negligent. The discretion exercised by a pilot in flying an airplane is clearly at the operational level and an abuse thereof or its negligent exercise is outside of the § 2680(a) jurisdictional exception. See Wildwood Mink Ranch v. United States, 218 F. Supp. 67 (D.Minn.1963); Dahlstrom v. United States, 228 F.2d 819 (8th Cir. 1956).

Section 2680(h)
Plaintiffs assert that defendant invited pilots to use Victor 16 in the area of the Kenton VOR without warning them of the risks which they would encounter, and in so doing in effect misrepresented the airway to be safe when in fact it was dangerous. Because plaintiffs' claim is based upon defendant's alleged misrepresentation, defendant argues that § 2680(h) deprives the Court of jurisdiction.
A failure to warn of an existing danger, when a duty to do so exists, is in a sense an implicit assertion that there is no danger. For some purposes, at least, this may be properly characterized as a misrepresentation. This is not the type of misrepresentation, however, that § 2680(h) was intended to cover. This is made clear by the comments in United States v. Neustadt, 366 U.S. 696, 711, n. 26, 81 S.Ct. 1294, 6 L.Ed.2d 614 (1960). Bartie v. United States, 216 F.Supp. 10 (D.La.1963) relied upon by defendant appears to be inconsistent with the Neustadt comments.[7] Other decisions cited by the Government are either distinguishable from the instant case or inconsistent with the views expressed in Neustadt.
Section 2680(h) does not deprive the Court of jurisdiction.

CAUSE OF THE INFLIGHT FAILURE
Of the four persons, Jones, Price, Weber and Hampton, who saw decedent's aircraft at or about the time of its failure, only two, Jones and Price, saw another aircraft. Neither Jones nor Price suggested that the two airplanes collided. The wreck of the Tri-Pacer gave no indication that its inflight failure was due to a collision. Huyler, a CAB investigator who examined the Tri-Pacer, found no propeller slashes, paint marks, indentations, or scratches on it to indicate that it had come in contact with another aircraft or other object. Neither party contends that the accident was caused by a mid-air collision.
The possibility of meteorological turbulence causing the failure must also be ruled out. This is so regardless of whether defendant's claim is accepted that the Tri-Pacer was flying at an altitude of 250 feet as Hampton testified, or plaintiffs' theory is accepted that disintegration of the Tri-Pacer began between 1500 and 2000 feet as Dr. Harry, plaintiffs' expert, testified. At either altitude, the winds were so light that, according to Dr. Harry, meteorological turbulence could not have caused the inflight failure. Neither party has offered meteorological turbulence as a cause of the failure.
There is no proof that the failure was caused by a mechanical or structural defect, or operational difficulty such as lack of gas. The right gas tank when found was partially filled. The structure of the Tri-Pacer gave no indication that it had experienced fire or an explosion. It had been inspected on June 5, 1958, and was certified as airworthy, which signified that it had been built and maintained in compliance with existing regulations. In the absence of contrary evidence, it must be presumed that the airworthy condition continued until the time of the accident, particularly as the next governmentally *506 required inspection was not due until June of 1959.
Decedent possessed a private pilot's certificate since May 5, 1956 for a single-engine airplane, land rating. He had accumulated total flying time of 339:41 hours, of which 322:46 hours were performed in the same make and model of aircraft which crashed.
Decedent was 31 years old and had been medically examined on September 15, 1958. On that date, a class II medical certificate was filed which required decedent to wear correcting lenses while exercising the privilege of his Airman's Certificate. Since there is no evidence to the contrary, decedent must be presumed to have been in good health when the accident occurred.
The Government offered no explanation of the accident. Although it pointed out that the propeller blades were bent in a minor way, and that the blade surfaces were in good, clean, condition, and without scratches or abrasions, indicating that the propeller was not being turned over by the motor at the time the airplane struck the ground, no evidence was offered to show whether the power failed before or after the disintegration began.
The Government further pointed to the fact that when the wreck was found, the fuse associated with the "master switch" was burned out, the master switch was in an auxiliary position, the ignition was in an "off" position, the throttle was in the full "open" position, and at or about the time of the disintegration, witnesses heard one or two explosions or noises.[8] The Government has not attempted to explain the significance of any of these facts, either as they may tend to negative plaintiffs' theory that the accident was caused by vortex turbulence, or with respect to the defense of contributory negligence. Unexplained, the evidence is without significance.
Dr. Harry testified that in his opinion the accident had been caused by the Tri-Pacer encountering turbulence from another aircraft. This opinion was expressed after he had examined a number of the structural parts of the Tri-Pacer and a photograph of the wreck before it had been moved. It was grounded upon this examination and hypotheses consistent with the facts heretofore stated.[9]
Dr. Harry testified that both wings failed in the air at about the same time, that this was due to the failure of the front and rear spars of the left wing and the front spar of the right wing, and that all these failures resulted from tension. He described tension as a pulling force. He explained that the tension had been caused by a downward or negative load or force being applied to the wings. Dr. Harry expressed the convincing opinion that the destructive downloads were caused by the wings encountering vortex turbulence from a larger aircraft.[10]
Dr. Harry's analysis of the problem and explanation of the manner in which the accident occurred appear to be sound. Defendant did not have the burden of proving the cause of the accident. It did, however, have the burden of providing some explanation other than that offered by Dr. Harry, if it wished the Court to reject that explanation. This the defendant failed to do. Dr. Harry's explanation that the failure of the Tri-Pacer was due to its having encountered turbulence from another aircraft is accepted.

*507 THE IDENTITY OF THE AIRCRAFT WHICH CAUSED THE ACCIDENT
The Tri-Pacer was flying at an altitude of between 1500 and 2000 feet when the inflight failure occurred. Hampton and Mrs. Weber saw no other aircraft except decedent's at the time of its failure. Jones and Price saw another airplane.
Jones testified that he was talking to Mrs. Weber in her lane when he heard two loud noises. He said he looked up and saw a large airplane and something behind it, and that "we didn't know exactly what it was, and then it just seemed to fly apart and start coming down, and we saw it was an airplane." At first, Jones said that it seemed like the large airplane was towing something behind it. He approximated that the small aircraft was two or three hundred feet behind the large aircraft and that both were about ¼ mile distant from him. Jones stated that the large airplane was going north or a little northeast when he first saw it, and that it then veered to the northwest and kept on in a straight line after the small airplane flew apart. He said the large plane was of "the general build of the Army airplane", but when pressed, he could not say whether it was powered by two or four motors. He said that there were always aircraft flying in the vicinity.
Price, who worked for Jones, also testified that he not only saw the airplane which was falling but also "a big one", that he had seen several like it in the area before, and that before testifying he had told plaintiffs' attorney that he believed the large airplane belonged to the Air Base. He fixed the small airplane as being a couple of hundred feet from the large one. When he was shown a picture of a C-124 he could not identify it as the type of large airplane which he had seen, or say whether there were any markings on the one which he had observed. He testified that the smaller airplane appeared to be going north towards Smyrna, and that the large airplane appeared to be going south toward Dover.
Another witness, Murray, testified generally about conditions in the vicinity of the Kenton VOR.[11] He stated that in 1958 he had observed C-124s using the Kenton VOR for practice, that they would head into the VOR, and then, when in its proximity, they would make a right or left turn. Murray stated that the C-124s approached the VOR from every degree on the compass and flew at altitudes from one thousand to five thousand feet.
The most intensive use of the VOR by the C-124s, according to Murray, was between 9:30 and 11:30 A.M. and 1:30 and 4:30 P.M. on days when the weather was fair and visibility was up to 15 miles. He approximated that on some days the C-124s made 60 to 80 practice runs in a period of three hours, and stated that all of them bore Air Force insignia.
On the day of the accident and at virtually the same hour, Murray was piloting his own airplane at about 1000 feet altitude in the vicinity of the Kenton VOR. To avoid being struck by two C-124s flying at a slightly higher altitude, Murray was required to take sudden evasive action. One of the C-124s came in from the port side and the other from the starboard side of Murray's airplane. Both of the C-124s were headed for the Kenton VOR.
Murray, Jr., after hearing of the accident, went to the scene at about 2:45 P.M. on the day it happened. While he was there an Air Force C-124 was circling the crash area.
Lindley G. Miller, decedent's brother and a co-plaintiff, arrived at the scene at about 1:15 or 1:30 P.M. the day following the accident, and remained for *508 twenty minutes to a half hour.[12] During that time Miller saw five to seven C-124s flying at approximately 1000 feet. In each instance they appeared to come in from the northeast, and then about ½ mile to the north of the scene they banked and headed over Miller in a southeasterly direction. The point at which the turns occurred approximated the location of the VOR. The pattern of flight, Miller said, was the same for each aircraft. The day was clear with only light winds.
In 1958 flyers who went out from the Dover Air Base for transitional training or instrument training were required to file at the Base a Form 1080 "Local Clearance" flight plan. A pilot could not make an instrument approach without first contacting the "approach control" personnel and obtaining clearance to make the approach. Statistics concerning the number of practice instrument approaches made in September 1958 were recorded on "approach control arrival strips." By interrogatories directed to defendant, plaintiffs sought to ascertain the total number of instrument approaches which used the Kenton VOR on September 23, 1958, the number that were actual instrument approaches, the number that were practice instrument approaches, and the number that had been made prior to the time of the accident. Plaintiffs could not get this information. Defendant stated that the "approach control arrival slips" which would have disclosed it had been destroyed after six months pursuant to "normal records disposition".
The day following the accident, Lindley Miller, decedent's brother, telephoned Colonel Parker, the Air Force Base Commander, and told him that he, Miller, had been at the scene of the crash, had observed C-124s flying in the area, and thought that one of the Air Force "boys" was responsible for the accident. Notwithstanding that Colonel Parker was thus forewarned that the responsibility of the Government for the accident might be asserted, the "approach control arrival strips" containing vital statistical information were destroyed. Under the circumstances, it must be presumed that if they had been retained, as they should have been, their revelations would not have been helpful to the Government. See United States v. Johnson, 288 F.2d 40, 45 (5th Cir. 1961).
Dr. Harry testified that the DC-6B, DC-7, C-133, C-124 and the C-121 (Super Constellation) aircraft were all capable of generating vortex turbulence which could have been destructive of the Piper Tri-Pacer under certain identical circumstances. In 1958, none of these aircraft, other than the C-124, flew in the area of the Kenton VOR at an altitude of less than 2000 feet. Only the Air Force used a C-124 type aircraft. No pilots from the Dover Air Base flew C-124s unless they were performing duties in connection with the Dover operation.
Records at the Air Base disclose that on September 23, 1958, there were only 6 C-124s which departed from the Base on scheduled and special missions. None of these left the Base at or about the time of the accident.[13]
Decedent's airplane in all probability suffered its inflight failure and crashed as a result of extreme wing tip vortex turbulence generated by an Air Force C-124 flying in connection with Dover Air Base operations, and in all likelihood the flying was non-operational.

DEFENDANT'S NEGLIGENCE
In September 1958 there were 63 aircraft of the C-124 type assigned to the Dover Air Force Base, of which 52.9 *509 were under its operational control.[14] Of these, 24.2% or approximately 13, were available for flying. The C-124s at Dover were engaged in cross-country and international cargo flights as well as local training flights. The local training included extensive instrument training under VFR conditions.
In September 1958 there were about 500 pilots at the Base. These consisted of aircraft commanders, first pilots and second pilots. About 400 were "line" pilots whose principal duties were to fly the C-124s. Roughly 100 were "desk" pilots who performed administrative as well as flying duties.
In 1958 there were 123,716 total operations at the Dover Air Base of which 120,858 were military.[15] In the third quarter of 1958 which included September, there were 26,132 total operations of which 25,284 were military, and in September 1958 there were 939 local flights, including training flights, 836 outbound clearances and 808 inbound clearances.[16]
During each quarter, all pilots were required to perform a certain number of precision and non-precision approaches, and semi-annually all were required to be evaluated for proficiency after an instrument check-ride. These activities involved practice instrument approaches under VFR conditions and other instrument training.
When a pilot practiced an instrument approach in a C-124 under VFR conditions, his vision was limited to the instrument panel by a hood which was placed over his head. A lookout for other aircraft was maintained by the instructor pilot who sat in the cockpit and by one other airman stationed in the aft lower level of the aircraft.
Throughout 1958 pilots from the Dover Base used the Kenton VOR for practice instrument approaches with C-124s in VFR weather. When an instrument approach was made via the Kenton VOR, the aircraft arrived at the VOR, flew northeasterly from it at 020 degrees for about 10 miles, swung further easterly at 065 degrees and flew for about three miles, made a 180 degree turn and headed southwesterly at 245 degrees and flew for about two miles, and finally turned in a southerly direction at 200 degrees and flew about twelve miles into the VOR. At the VOR the aircraft changed course again and flew southeasterly at 166 degrees for about seven miles to the landing field at the Base.[17] The aircraft was required to fly at 1500 feet at the point when it began its 200 degree heading,[18] and from that point gradually descended to 1,028 feet over the VOR. The procedure followed is depicted on PX 10. The testimony of Murray, previously discussed, indicates in a general way just how extensive the maneuvers over the Kenton VOR were on some days between 1:30 and 4:30 P.M. when the weather was clear.
Defendant attempts to minimize the extent to which the C-124s maneuvered in the area of the Kenton VOR. It asserts that other approaches designated as the ILS, GCA, TVOR, and ADF were also utilized for practice instrument approaches, that whereas the Kenton approach and the surveillance GCA approach were from north of the Base, all of the others, including the GCA precision approach, were from south of the Base. Defendant further notes that *510 the primary runway at the Base was runway 01 which was a south-to-north runway, that it was the most desirable runway to use in instrument conditions, had the most efficient landing system, and that approaches on it and the southeastern runway were made more frequently than from the Kenton approach. Landing lights were at the southern, not northern, end of the Base.
These facts, however, do not negate the extensive use which was made of the VOR by Dover-based flyers. A pilot would sometimes complete an ILS approach from the south and then, with approval of Approach Control, go north of the Base to the Kenton VOR and make an approach on it. Furthermore, the practice instrument approaches which were made over the Kenton VOR were not all concluded by a full stop on the airfield. Some resulted in a touch and go landing (touching down briefly and then circling to repeat the approach), or simulating a missed approach. In such cases the aircraft would follow the missed approached instructions shown on PX 10, make a left climbing turn to 1500 feet, return north to the Kenton VOR and receive further instructions from Approach Control. C-124s making southerly practice approaches (either touch and go or simulated missed approach), as well as planes taking off on the runways from the south and southeast, would fly north of the field and frequently cross Victor 16, often in the vicinity of the Kenton VOR depending upon the flying plans. In practicing VFR landings visually (not simulated instrument approaches) on all runways, C-124s coming from the north or south would cross Victor 16.
Defendant also emphasizes the fact that in August 1958 the Dover Base was an operational base and not a training base, and that for the balance of the year, many of the planes assigned to the Dover Base were away supporting the United States during the Lebanon crisis. In September 1958, eight to nine planes were in daily use on operational missions, and three to four planes were used daily for local training. According to Major Galloway, who in 1958 was the Base Operations Officer at Dover and the direct representative of the Commander, each one of the three or four airplanes available for local training was scheduled to fly three five-hour missions each day. Obviously they were capable of multitudinous landings and other training maneuvers during this time.
The fact that Captain Wagner had used the Kenton VOR approach only once or twice, between August and December 1958 when he was stationed at the Dover Base, means little. His tour at Dover followed immediately after a training period at Palm Beach where he had been qualified as "a full-fledged co-pilot". This made him available to perform overseas trips immediately and limited his local flying at Dover. His local flying experience was not typical of that of all of the other flyers at the Dover Base.
During 1958, pilot training was being conducted from the Dover Base which included frequent and intensive use of the Kenton VOR for the practice of instrument approaches, and other instrument practice involving frequent crossing of Victor 16 from all directions, as well as operational use of the VOR. The records which would have given precise statistical information as to the nature, extensiveness and frequency of these activities, have been destroyed by the Government. Plaintiff should not suffer because of their unavailability.
It is common law negligence for one to create an unreasonable risk of harm to others, and if damage to others is proximately caused thereby, an action will lie. Law of Torts, Prosser § 30 (1955); Restatement of the LawTorts, §§ 282, 291, 302 (1934). That the Kenton VOR created an unusual hazard of mid-air collision between the C-124s and civilian aircraft using Victor 16 in the vicinity of the Kenton VOR and created an abnormal risk to such civilian aircraft of encountering destructive vortex turbulence generated by the C-124s cannot be doubted.
*511 But whether the flying activities, independently of the failure of the Government to give notice of them, were so unreasonable as to constitute negligence, as plaintiffs contend, is not so clear. This depends upon numerous factors; for example, the necessity for using the VOR for adequate pilot training, the availability of other facilities that could have been used with less hazard, and the type of training normally authorized by Air Base Commanders under comparable circumstances. No proof in these areas was adduced. Without it, it cannot be said that the conduct of the Commander in scheduling the flight activities complained of was such a departure from what a reasonably prudent Air Base Commander would have done under like circumstances as to constitute negligence. This, of course, is the real test.
There is no merit to plaintiffs' contention that negligence per se or at least strong evidence of negligence has been demonstrated by the Commander's violation of Air Force Regulations, AFR 55-19, par. 1, 1a, 1b, and 5a.[19] The evidence fails to establish that it would have been practical for the Commander to have utilized less congested air space than that which existed in the vicinity of the Kenton VOR for the particular type of practice landings which apparently he deemed essential. Nor has it been shown that outlying facilities were available for use comparable to that to which the Kenton VOR was put. Without such proof it cannot be found that paragraph 1a or 5a were violated.[20] In any event the purpose of the Regulations was not to protect civilian flyers. Their stated aim was to foster "safe and efficient local Air Force flight[s]" and to provide a guidance for insuring "maximum safety and efficiency in [Air Force] local flying operations". Thus, the Regulations created no duty in favor of civilian flyers, and their violation, if any there was, gave rise to no cause of action by plaintiffs. In Restatement of the Law  Torts, § 286 (1934), Comment on Clause (a), p. 755, the principle is stated that when a statute or ordinance, because of its title, preamble, history or otherwise, is construed as intended to protect only the interests of a particular class of individuals, a violation of the enactment will make the actor liable only to a person of that class. This principle was implicitly applied in Mahler v. United States, 306 F.2d 713, 721-722 (3rd Cir. 1962), cert. den. 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962). By *512 analogy the same principle is applicable to a violation of a regulation of an administrative body, such as AFR 55-19.
But when the flight activity in and about the Kenton VOR is considered in light of the encouragement which the CAA held out to civilian flyers to use Victor Airways and navigational aids such as the Kenton VOR, the failure of both the CAA and the Commander to warn civilian flyers of the unusual and abnormal risks which they would encounter in entering the area of the Kenton VOR, is of critical significance.
Following mid-air collisions between Air Force aircraft and commercial airliners in Nevada and Maryland in the spring of 1958, the Air Force reviewed flying conditions at various Bases, including Dover. During this time the Commander at Dover realized the dangers inherent in the maneuvers which were being carried on over Victor 16 in the vicinity of the Kenton VOR and elsewhere. On June 14, 1958, the Dover Base sent a message to Headquarters ATLD requesting immediate and urgent consideration "of the adjacent civil airway conflict with the Dover local flying area," and asking that "all-over flights in the Dover area be raised to 6000 feet". On June 15, 1958, telephone calls from the Dover Base were made to the New York and Washington Centers requesting that "no flight crossing the new Dover local area be cleared lower than 6,000." This latter request was denied. On July 9, 1958, Major Reagan, Administration Chief at Dover, wrote to the Commander of the Eastern Transport Air Force, MATS, and made certain requests "[t]o effectively minimize near-miss and mid-air collision potential in the Dover area". The letter stated that it was impossible to depart VFR traffic from the Dover Base "without crossing an airway or airways in all directions. * * * It is, therefore, most urgent that action be taken to restrict airways traffic `over-flying' Dover to a minimum enroute altitude of 5000 feet. This will permit aircraft to operate VFR in the local areas without interference with airways below 5000 feet." This request was made specifically with reference to "Victor 16 between Shadyside intersection and Coyle intersection". This included a segment of Victor 16 in the vicinity of the Kenton VOR. The safety measures which the Dover Command deemed to be so vital were never taken.
On September 23, 1958 and prior thereto, the CAA and the Commander of the Dover Base knew of the use which was being made of the Kenton VOR and the flying activities in Victor 16 adjacent thereto.
Civilian pilots were encouraged by the CAA to use airways such as Victor 16 and navigational facilities located along there such as the Kenton VOR because of the safety and navigational convenience which results from their use.
The standard and encouraged method of warning pilots planning cross-country flights of hazards was by NOTAMs. They were frequently issued for the purpose of warning pilots of hazardous flying activities in and about military air bases and civilian airports and advising pilots either to avoid the areas or exercise extreme caution. These warnings could be issued by Air Force bases or airports where the hazardous condition existed or could be published by the CAA.
NOTAMs were usually originated by being placed on a teletype circuit which was also used for weather information. By that method they were distributed to airports on the teletype circuit. NOTAMs of the more permanent type ultimately appeared in a bi-weekly publication of the CAA known as the Airman's Guide. Airports such as Zahn's Airport, from which decedent's flight originated, received the teletype NOTAMs and Airman's Guide, and pilots originating flights at such airports would, as a matter of routine practice, examine such NOTAMs in flight planning so as to be advised of enroute hazards.
The sectional charts, such as the Washington Sectional Chart which encompassed the Dover Base and the Kenton VOR were published by the United States *513 through its agency, The Coast and Geodetic Survey. These charts included information taken from NOTAMs and were used by pilots in flight planning and in flight. The sectional charts included designations of airways and navigational aids established by the CAA, as well as references to restricted areas, warning areas and control zones. The sectional chart as well as the Airman's Guide encouraged pilots to read NOTAMs.
There was no Dover NOTAM and no reference to flying activities in the vicinity of the Kenton VOR on the sectional chart or on the other charts which pilots sometimes used. Although the sectional chart did disclose two leg extensions from the circumference of the Dover Base Control Area to the south and southeast in the areas of the south and southeast runways, thereby indicating that flying activities in connection with landings might be encountered, no similar extension of the control area was shown in the direction of the Kenton VOR.
Similarly, although NOTAMs in the Airman's Guide disclosed extensive air penetration in the vicinity of other air bases due to training and other activities, it said nothing about Dover. While in many instances the activity warned against was not comparable to that of Dover, in at least one case the warning gave no indication of the nature of the activity. The Donaldson Air Force Base notice merely said:
"GREENVILLE-SPECIAL NOTICE: Intensive activities by C-124 type aircraft within 25 miles of [Greenville range]. All pilots exercise extreme caution and, if possible, avoid [flight] in the proximity of Donaldson Air Force Base."
A terse notice of this kind would have been appropriate for Dover.
The character and extensiveness of the activities of Dover-based flyers over Victor 16 in the vicinity of the Kenton VOR created a potential danger to civilian airmen which imposed a duty on the Commander and the CAA to issue a NOTAM or otherwise warn them of the area hazard. Reasonably prudent persons would have done so under comparable circumstances. Failure of the Commander and the CAA to do so constituted negligence on the part of the defendant.
Plaintiffs advance the additional theory that the accident was also caused by the negligence of the pilot of the C-124. This is based solely on the claim[21] that the pilot flew his C-124 within 500 feet of the Tri-Pacer and thereby violated AFR 60-16, par. 5.[22]
Jones testified that when he saw the two airplanes the small one was "just a short distance" behind the large one, that it was "hard to say exactly" how close they were, but that he would approximate the distance to be "probably 200 or 300 feet". Price said that the big airplane was "a couple of hundred feet" from the little airplane.
On the other hand, Dr. Harry stated that in his opinion the Tri-Pacer penetrated the turbulence one-half minute to one minute after its generation and probably closer to a half minute. In his view, the paths of the airplanes were at right angles to each other and the altitude of each was the same. If this testimony is accepted it is not possible for the C-124 to have been as close as 500 feet to the Tri-Pacer.
It cannot, of course, be said whether the eyewitness testimony of Jones and Price is more accurate than the theoretical testimony of Dr. Harry. Dr. Harry was the more convincing of the two. In any event, the state of the evidence is such that it cannot be said that a preponderance of the evidence establishes negligence on the part of the pilot.

*514 PROXIMATE CAUSE
The negligence of a defendant standing alone does not establish legal liability. To create liability the negligence must be a proximate cause of the injury, that is to say, a cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which it would not have occurred. James v. Krause, 6 Terry 404, 75 A.2d 237, 241 (1950); Biddle v. Haldas Bros. Inc., 8 W.W.Harr. 210, 190 A. 588, 596 (1937).[23]
In order for defendant's negligence to be a proximate cause of the accident, a finding is required that in all likelihood the accident would not have happened if the CAA or the Commander at Dover had issued an appropriate warning to civilian flyers of the flying activities which were being conducted on Victor 16 in the vicinity of the Kenton VOR. The basis for such a finding presents a problem. Plaintiffs do not say how decedent would have avoided the accident if he had been told of the conditions which existed over the Kenton VOR. Conceivably, he might have cancelled his trip, flown another route or at a higher altitude, traveled by commercial airline, railway or bus, employed a more experienced pilot, or simply exercised a higher degree of alertness. There is no direct evidence bearing on any of these possibilities or others that can be imagined. Nor does the evidence provide a basis for drawing any reasonable inference as to any of them.
If decedent had been forewarned of conditions which he might encounter, but nevertheless continued with his original flight plan, it may be assumed that he would have operated his airplane more cautiously than he actually did. But it is conjectural whether the difference in the degree of caution would have been so significant as to have saved him. After all, decedent knew that when he was over the Kenton VOR he was within seven miles of a large military installation, that an omni range was extensively used for navigation and in landing procedures, and that landings were frequently practiced at airfields. His instructor had told him of the extreme danger of vortex turbulence. Even without a warning, this information was sufficient to make decedent particularly sensitive to the possibility of encountering aircraft in the area of the Kenton VOR. When the accident occurred there was only one C-124 in the vicinity. So that it cannot be presumed that any additional alertness on the decedent's part would have prevented the accident.
Nor will the law which the plaintiffs cite justify a presumption that the accident would not have occurred if decedent had been forewarned of the Air Base activities on Victor 16 in the vicinity of the Kenton VOR. In the cases cited by plaintiffs the causal relationship between the failure to warn and the injury was so patent that the issue of proximate cause was not even discussed, except in Cammer v. Atlantic Coast Line, 214 S.C. 71, 51 S.E.2d 174 (1948).[24] A Court is justified in presuming a person will avoid crossing a railroad track at a grade crossing in front of an oncoming train if a warning bell or blinking light is operative, Pennsylvania R. Co. v. Tharp, 189 A.2d 423 (Del.Sup.Ct.1963); that a pilot will avoid running into a rock pile on a runway if it is illuminated, Plews v. City of Lancaster, 171 Pa.Super. 312, 90 A.2d 279 (1952); that the operator of a truck on a taxiway on an airfield will move out of the way of a descending airplane if he is warned of its approach, Marino v. *515 United States, 84 F.Supp. 721 (E.D.N.Y. 1949). In cases of this type the Courts implicitly recognize, usually without saying as much, that as a matter of experience in all likelihood a person will avoid the danger if warned of it. But these cases involve an immediate danger where the prospect of injury was certain.
In the instant case, if a NOTAM had been issued it would not have alerted the decedent to any immediate danger or inevitable harm. While it cannot be foretold with certainty what such a NOTAM would have said, in all likelihood it would simply have announced that extensive training might be encountered in the Dover area and that pilots entering the area should use extreme caution. See AFR 55-19, par. 1b. But decedent knew that omni ranges were extensively used for navigation and landings and that the Kenton VOR was located close to a large Army Air Base at Dover. Even without a NOTAM decedent must have realized that a low altitude flight over the Kenton VOR might involve unusual hazards. It cannot be presumed that decedent would have taken action to avoid this known potential danger if a NOTAM had been issued. Compare Dugroo v. Garrett, 203 Va. 918, 128 S.E.2d 303 (1962); Cozart v. Hudson, 239 N.C. 279, 78 S.E.2d 881 (1954); Egan v. Connecticut, 131 Conn. 152, 38 A.2d 282 (1944); Zamecnik v. Royal, 239 Wis. 175, 300 N.W. 227 (1941).
The case at bar contrasts sharply with those cited by plaintiffs where failure to warn was presumed to be the proximate cause of the injury. The basis for the presumption in those cases is lacking in the case at bar. Plaintiffs have failed to bring to the Court's attention, and individual research has failed to disclose, any decision where a failure to warn has been held to be the proximate cause of an injury under facts similar or analogous to those here present.
It is, of course, possible that if decedent had been warned of the hazard which awaited him, he would have pursued some course of action by which the accident would have been avoided. But the possibility that decedent would have done so is not enough. 38 Am.Jur., Negligence, § 61, p. 712.
Plaintiffs have the burden of proving that as a matter of reasonable probability the accident would not have happened if a NOTAM had issued or if civilian flyers had been otherwise warned of the flying activities at the Dover Base. Neither the evidence nor the law will support that conclusion.

DECEDENT'S CONTRIBUTORY NEGLIGENCE
The parties agree that a rebuttable presumption exists that decedent was acting with due care when the accident occurred. Nevertheless, defendant argues that the presumption is overcome by the evidence and that a finding is required that the decedent was negligent and that his negligence was a proximate cause of the accident. The record discloses the following pertinent facts:
According to Dr. Harry, in order for the Tri-Pacer to be destroyed by the turbulence of the C-124, it was necessary for both airplanes to be flying at the same altitude, in the same plane, and for the two flight paths to have been at almost right angles to each other. He stated that implicit in his definition of a right angle path "were rectalinear motions without any curving of the two aircraft paths." (Tr. 1728). In attributing the accident to vortex turbulence, Dr. Harry assumed that the Tri-Pacer had penetrated the vortex "within one-half to one minute after the generation, and probably much closer to a half-minute after generation." (Tr. 1618).
If the Tri-Pacer penetrated the turbulence at one-half minute after it was generated, as Dr. Harry thought most likely, and the Tri-Pacer was traveling at 120 miles per hour, a reasonable cruising speed to hypothesize, then the Tri-Pacer was one mile distant from the C-124 at the time when it generated the turbulence. If the C-124 was traveling *516 at a speed of 170 miles per hour,[25] which is a reasonable assumption, then the C-124 was 1.4 miles distant from the Tri-Pacer when the Tri-Pacer penetrated the turbulence. Under the same set of assumptions, the Tri-Pacer would have been two miles from the point where it ultimately intersected the turbulence when the C-124 still had 1.4 miles to go before it arrived at the point where it generated the turbulence which the Tri-Pacer penetrated. If the penetration had occurred one minute after the generation of the turbulence, the most remote time hypothesized by Dr. Harry, the distances which separated the aircraft at the times indicated would have been correspondingly greater.
When the accident occurred, the surface observation indicated high, thin, scattered clouds with a visibility of 15 miles. On a clear day, a C-124 can be seen from five miles and can easily be recognized as a C-124 at a distance of two miles. In view of the flight patterns of the C-124 and Tri-Pacer hypothesized by Dr. Harry, the decedent either saw or should have seen the C-124 well in advance of the time when the C-124 passed in front of it, and well in advance of the time when it passed behind the C-124 into the path of the trailing turbulence. Decedent, therefore, had ample opportunity to avoid encountering the turbulence by either altering the direction or altitude of the Tri-Pacer.
The decedent should have been particularly vigilant in using Victor 16. He knew that the Kenton VOR was only seven miles from the Dover Air Base, was located on Victor 16, and that Victor 16 passed within two or three miles of the perimeter of the control zone of the Dover Base. Furthermore, decedent knew that southwest of Dover, Victor 16 passed over a leg of the control zone of the Andrews Air Force Base and to a minor extent, that of the Bolling Air Force Base. All this was shown on the sectional chart, PX 3, which was a standard reference for a VFR flight. Decedent kept sectional charts in his plane, knew how to read them, and used them in planning his flights. Decedent was familiar with the route for he had flown over it several times as recently as the summer of 1958.
Any pilot who is about to pass an Air Force Base knows, or should know, that other airplanes may be encountered in the vicinity. Although the turbulence was invisible, Mr. Bond, decedent's flying instructor, had informed the decedent that turbulence was extremely dangerous and that he should not fly in the wake of a large aircraft.
As compared with the single engine Tri-Pacer with the maximum allowable gross weight of 2000 pounds, the four engine C-124 military transport with gross weight ranging between 110,000 and 195,000 pounds, depending upon its cargo and fuel load, was a large airplane. Of the two the Tri-Pacer was the more maneuverable. By changing the direction or altitude of its flight it could have avoided the C-124 more easily than the C-124 could have avoided it.
Under VFR weather conditions, the ultimate responsibility for the safe operation of an aircraft rests with the pilot. He is under a duty to observe and *517 avoid other traffic, even if flying with traffic clearance. United States v. Miller, 303 F.2d 703, 710 (9th Cir. 1962); cert. denied, 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1962).[26]
The failure of decedent to observe and avoid the C-124 constituted negligence on the part of the decedent.
Mr. Bond, decedent's flying instructor, testified without contradiction, that when a pilot is flying near or adjacent to a control zone it is good operating or safety procedure for him to fly above 2000 feet. The accident occurred just outside the Dover Air Base control zone when decedent was flying between 1500 and 2000 feet. In flying below 2000 feet, decedent was negligent in that he failed to fly above that altitude as good operating and safety procedure required.
Contributory negligence is the failure to exercise that degree of care for one's own safety that a reasonably prudent man would have exercised under similar circumstances. The duty of care increases in direct proportion to the hazards involved. In the instant case the standard to be applied is that of the reasonably prudent pilot flying on a civilian airway in the vicinity of a VOR located two or three miles from the perimeter of a control zone pertaining to a large military air base only seven miles distant from the VOR. By failing to see and avoid the C-124 and by flying below 2000 feet when he was flying close to the control zone of the Dover Base, the decedent failed to exercise that degree of care that a reasonably prudent person would have exercised under similar circumstances.
Plaintiffs are not convincing when they argue that no pilot could reasonably expect to find C-124s practicing in a civil airway on a navigational aid under the circumstances revealed by the present record. The fact is that in 1958 a large number of practice instrument approaches were made on civilian airways, when the aids necessary for the approaches were located on the airways. This was true in the case of both military and civilian training. Such approaches were made at every airport, municipal, local or otherwise, that had an instrument approach procedure. Activity of some kind should have been anticipated by decedent as he approached the Kenton VOR. The fact that on occasion there was intensive use of the Kenton VOR for practice instrument landings presented no particular problem for decedent, for when the accident occurred there was only one other airplane in the area.
The negligence of decedent contributed to and was a proximate cause of the accident.

SUMMARY OF FINDINGS AND CONCLUSIONS
1. The jurisdiction of the Court under 28 U.S.C. § 1346(b) is not curtailed by 28 U.S.C. § 2680(a) or (h).
2. The failure of the Tri-Pacer was due to encountering Vortex turbulence generated by a C-124 operated by a United States Air Force pilot in the scope of his duties at the Dover Air Force Base.
3. The Commander of the Dover Air Force Base was not negligent in scheduling the flying activities complained of.
4. The CAA and the Commander were negligent in not warning civilian airmen, including decedent, of the unusual flying hazards which existed by reason of the flying activities complained of.
5. Plaintiffs have failed to establish that the negligence of the CAA or the Commander was a proximate cause of the accident.
6. If the accident was proximately caused by the negligence of the CAA or the Commander, decedent's own negligence was also a proximate cause thereof.
7. The action should be dismissed.
The foregoing opinion constitutes the Findings of Fact and the Conclusions of Law required by F.R.Civ.P. 52(a).

*518 RULINGS ON OBJECTIONS OF PARTIES TO EVIDENCE ADMITTED AND EXCLUDED
During the trial the Court made a number of rulings on the admissibility of evidence. In certain instances, the parties were asked to brief the law on such of the rulings to which they desired to except. Each of them has done so.
Testimony by Bond, decedent's flying instructor, as to flying instructions which he gave to decedent.
Bond, decedent's flying instructor, was asked by plaintiffs' counsel what instructions he gave decedent in planning cross-country flights. (Tr. 785). The purpose of the question was stated to be "to show the probable manner in which * * * [the decedent] planned and flew this particular flight, * * * to show habit in flight." (Tr. 785-6). Defendant's counsel objected on the ground that there was no indication that the instructions, if given, would have been followed. (Tr. 785). The Court sustained the objection but, having reservations about the soundness of the ruling, permitted the testimony (deposition) to be read into evidence under F.R.Civ.P. 43(c). (Tr. 786).
Plaintiffs admit they have found no specific authority supporting the admission of the evidence. They urge, however, that the instructions given to decedent are analogous to habit, course of conduct or custom, and that the challenged testimony was not intended to establish that the decedent was skillful or careful, but to show that he normally did certain mechanical things in connection with his flying and preparing therefor. The distinction is dubious. Whether or not decedent followed the instructions which Bond gave him bore importantly upon the degree of care which decedent used, and in some particulars was relevant to the cause of the accident. It cannot be assumed that because decedent was instructed in a particular way he followed the instructions. The testimony is irrelevant to establish that in flying and in preparing for flight decedent actually did those things which Bond told him to do.
Bond's testimony was admissible, however, to show decedent's knowledge of various subjects pertaining to flight activities regardless of whether the instructions were carried out. The evidence is admissible for this limited purpose and it has been so regarded by the Court.

Testimony of Colonel Parker as to the identity of the aircraft which caused the accident.
After Lindley Miller, decedent's brother, returned to Dover from the scene of the accident on the day following its occurrence, he telephoned Colonel Parker, the Air Base Commander. At the trial, after relating a discussion which he had with Colonel Parker about the accident, Miller said: (Tr. 478)
"My next comment after that was, `Well, I think it was one of those boys that did it'; at which point he indicated that he was inclined to agree."
The context shows that in referring to "those boys" Miller meant flyers from the Dover Air Base.
Upon objection being made (Tr. 478), the Court excluded the testimony. (Tr. 479).
The Court has found, independently of Colonel Parker's testimony, that the accident was caused by turbulence generated by a C-124 flying in connection with the operations at the Dover Air Force Base. The propriety of the Court's ruling in excluding the above portion of the Miller testimony is, therefore, moot. The trial ruling, whether right or wrong, has not been prejudicial to plaintiffs.

Plaintiffs' Interrogatory 91.1 and the Answer of the Defendant Thereto.
Plaintiffs offered in evidence interrogatory 91.1 which they had propounded to the defendant, and the latter's answer:

Interrogatory 91.1:
"With respect to the information contained on page 7 of the factual *519 report of investigation of the Civil Aeronautics Board, dated May 19, 1959, prepared by Russell J. Abbott in connection with the investigation of the crash which is the subject matter of this litigation, which information is as follows:
"`* * * during the month of September, 1958, there were 7,000 operations at Dover Air Force Base and 1,777 practice instrument approaches made. Approaches on the Kenton VOR were included in this figure. In addition to transient operations there were 45 local flights conducted from the Dover Air Force Base on September 23, 1958. At 1400, Runway 01 (010 degrees) was in use at Dover Air Force Base.'
"Please state the following:
"91.1 The source of said information."

Answer: "Contrary to plaintiffs' counsel's claim at the hearing of objections to this interrogatory, that at his deposition Mr. Abbott was not permitted to testify, Mr. Abbott stated under oath that any information he obtained as to records were obtained from CWO Mader and Captain Bergen. Former Chief Warrant Officer Mader had already been deposed." (Tr. 1395-1396).
Initially, counsel for plaintiffs stated that the purpose of the offer was to prove an admission by the Government that the information contained in the report of the CAB prepared by Abbott had been obtained from Mader. Later, plaintiffs' counsel stated that the purpose was to get "the factual observations made by Mr. Abbott in the record * * *." (Tr. 1401).
Government's counsel objected to the offer upon the ground that plaintiffs were utilizing the interrogatory and answer to get the CAB report into evidence indirectly in spite of the prohibition of 49 U.S.C. § 1441(e), and that in any event, the answer was hearsay.
The Court admitted the evidence on the condition that the pertinent law be briefed after the close of the case. (Tr. 1402).
At the outset, it is to be noted that no part of the CAB report as such was offered in evidence. However, by embodying a portion of the report in the interrogatory, plaintiffs have attempted to "use" a part of the report in the action. Read literally, Section 1441(e) prohibits any part of the CAB report being "used" in an action. The statute, however, was not intended to be construed so literally. Its primary purpose was to exclude CAB reports which express agency views as to the probable cause of an accident. To the extent that a report embodies facts assembled in connection with an investigation, and does not reflect the CAB's findings as to the probable cause of a crash, the statute does not exclude a report. Berguido v. Eastern Air Lines, 317 F.2d 628, 631-632 (3rd Cir.), cert. denied, 375 U.S. 895, 84 S.Ct. 170, 11 L.Ed.2d 124 (1963). The portion of the report incorporated into the interrogatory is entirely factual and does not express any view as to causation. So that § 1441(e) does not require the exclusion of the interrogatory and answer.
The hearsay rule, however, does. The answer to the interrogatory discloses that the number of operations, practice instrument approaches, etc., which the report sets forth was obtained by Abbott, who signed the report, from Mader and Captain Bergen. If Mader and Captain Bergen had first hand knowledge of the facts stated in the CAB report, their testimony was necessary to establish them.
Perhaps if the CAB report had been shown to be a "business record" under the Federal Business Records Act, 28 U. S.C. § 1732 (Supp. 1962), another conclusion might be justified. But it was not so qualified.
The Court, therefore, committed error in admitting into evidence at the trial interrogatory 91.1 and defendant's answer thereto. The error, however, was *520 not prejudicial to the Government inasmuch as neither the interrogatory nor the answer was relied upon by the Court in making any finding which was adverse to the government.

Dr. Harry's Expert Testimony
Plaintiffs' theory that the Tri-Pacer failed because of vortex turbulence generated by another aircraft rests upon the testimony of their expert witness, Dr. Harry. To understand properly the objections which defendant has made to the admissibility of Dr. Harry's testimony, a general statement concerning the nature and effect of turbulence will be helpful. Dr. Harry's testimony on the subject can be summarized this way
Turbulence associated with aircraft is a fundamental property of the wings. The wings of an aircraft in level flight are not parallel to the ground but are pitched at about 5 degrees. The leading edge of the wing is higher than the trailing edge. Turbulence is induced by the wings moving through the air. In doing so, they depress the air behind them (just as a book tilted at an angle would depress sand if the book were drawn through it) and thus produce a trough in the air. The air at the edges of the trough falls back into it with a rotating motion. A cornucopia of rotating air is thus formed behind each aircraft wing.
The rotation of the air is called the vortex. The vortex is the cause of the turbulence. The vortex associated with the right wing, as viewed from behind the airplane, is called the right hand vortex, and that associated with the left hand wing is designated the left hand vortex. The direction of the right hand vortex is counterclockwise while that of the left hand vortex is clockwise.
A relatively small area in the center of the vortex is called the core. It is analogous to the eye of a hurricane. The air surrounding the core, extending out from the core to a distance of some ten times the diameter of the core, has sensible velocities induced into it by the rotating air within the core. The maximum velocity of the air is at the right edge of the core, and the velocity becomes less the further the distance from the core.
The full velocity of a vortex is probably developed one second after the wings have moved past the point of generation. A vortex is not fully developed in the sense of being expanded outwardly to its maximum extent until approximately 500 feet behind the point of generation.
Once a vortex is created, its duration will depend upon air conditions around it. If the air is still, i. e. about 3 knots or less, the vortex can exist essentially unabated for perhaps five to eight minutes. In air speeds of 6 to 10 knots, the vortex will have essentially the same strength one-half minute after generation as it had immediately after its generation.
After the vortex is generated, it starts to sink. While the sinking speed depends upon the aircraft generating it, 2½ to 3 feet per second is representative. In thirty seconds the vortices would drop something like 90 to 100 feet.
Vortices have no more or less visibility than the air of which they are composed. If the air is clear, free from smoke, droplets of condensed water, or other visible matter, vortices will be invisible.
In response to the first hypothetical question, Dr. Harry testified that the disintegration of the Tri-Pacer began at an altitude of between 1500 and 2000 feet. (Tr. 1528). He expressed this opinion upon the basis of assumptions of fact substantiated by the record which the Government does not challenge. (Tr. 1520, as modified at Tr. 1522, 1525 and 1527).
Dr. Harry was next asked to state "the manner in which the failure in flight occurred", based upon the substantiated factual assumptions which underlay the first hypothetical question and his personal examination of a number of the *521 structural parts and a photograph of the wreck (Tr. 1551). His complete answer is found at 1552-1564, and is summarized at 1561-1562:
"The right front spar failed in its strap at the attachment bolt to the wing carrythrough structure, and this failure was a tension failure. At a subsequent time the right rear spar failed at its fuselage carrythrough attachment, but that failure was associated with a rearward and a downward bending of the part."
"If we go to the left wing it is my opinion that these spar failures are tension failures and they occurred at very nearly the same time, * * *."
"* * * It is a tension failure in the left rear spar in the strap attached to the web of the spar. It is a tension failure in the tubular carrythrough structure of the fuselage forward carrythrough structure. Both are tension failures."
The Government has expressed no objection to the above questions or answers. The thrust of the Government's objection begins with the next question.
By it plaintiffs sought to elicit the "cause" of the failure, based upon the manner in which the parts had failed (the subject of Dr. Harry's last answer) and certain hypothesized facts substantiated by the record. (Tr. 1565-1566). Defendant objected on the ground that the question called for an opinion based upon a prior opinion (Tr. 1566). The objection was overruled (Tr. 1567) and Dr. Harry stated it to be his opinion that the accident was the result of the Tri-Pacer encountering turbulence from another aircraft (Tr. 1567).
Dr. Harry was then asked, based upon the preceding hypothetical question and his response, to state his opinion "as to the manner in which the turbulence from another aircraft caused the in-flight break-up of the Piper Tri-Pacer". (Tr. 1586). The Government objected to this question on the ground that "we are really getting into speculation as opposed to opinion evidence based upon the evidence in this law suit." (Tr. 1587). The Court overruled the objection, stating that the objection would be considered after the testimony had been transcribed, and if it then appeared that the Government's position had merit, it would be reflected in the Court's decision (Tr. 1587). Dr. Harry answered the questions substantially as follows (Tr. 1587-1605):
When a pilot encounters the extended activity of a vortex, i. e. rotating air currents remote from the actual core by about 200 feet, the loads on the aircraft are upward, and the lift which it encounters is greater than the normal one in a level undisturbed flight. When the pilot is suddenly aware that the airplane is being subjected to additional vertical upward loads, his normal reaction is to relieve the airplane of these loads by putting his airplane in a somewhat nose-down attitude to compensate for the positive (up) loads which he has experienced. The airplane therefore enters the core of the vortex in a nose-down condition. The time required to transverse the core is in the neighborhood of tenths of seconds. The pilot has insufficient time to correct the nose-down attitude of the airplane before it emerges from the other side of the core. When it does so, the aircraft experiences a heavy download. The double effect of the download of the vortex and the nose-down attitude of the aircraft results in a download, which if the vortex is generated by a large heavy aircraft, is sufficient to fail the wings of a small airplane such as a Piper Tri-Pacer in a downward direction, and to create tension breaks at the spars of the type that were found when Dr. Harry examined the parts of the wreck.
The Government moved to strike the entire answer on the grounds, first, that it was not responsive, and second, Dr. Harry had not stated "the angle at which the aircraft penetrated or at what altitude, and there is nothing in the evidence to support such assumptions." (Tr. 1604-1605). The Court denied the motion. (1606). Dr. Harry was then asked *522 to state his opinion as to the angle at which the penetrating aircraft encountered the turbulence of the generating aircraft, "based upon the assumptions which were given to you in previous hypothetical questions and your opinion as to the fact that the destruction here was caused by turbulence" (Tr. 1609). The Government objected to this question "unless the specific assumptions relied on are stated." (Tr. 1809). The objection was overruled (Tr. 1609), and Dr. Harry responded: (Tr. 1609)
"A. My opinion is that the two flight paths must have been rather close to right angles."
Thereafter, questions were asked by plaintiffs' counsel and answered as follows (1609-1610):
"Q. And would you describe what you mean by right angles?
"A. Yes, sir. The direction of motion of the smaller aircraft was approximately parallel to the direction of the wing of the generating aircraft, that is, the spanwise direction of the wing. We are talking now not of an aircraft in a vertical motion compared to an aircraft in a horizontal motion. We are talking of two aircraft within the same plane in their motion."
* * * * * *
BY THE COURT:
"Q. It is almost like the directions of automobiles at an intersection, you would say?
"A. Yes, sir.
"Q. A right-angle intersection?
"A. Yes, sir, a right-angle intersection."
Next Dr. Harry was asked to state the relative altitudes of the two aircraft "based upon the assumptions in previous questions and * * * [his] last answer with respect to the angle of approach * * *." (Tr. 1610). He responded by saying that in his opinion the two airplanes were flying on the same plane and at virtually the same altitude.
In its brief the Government makes two objections to the admissibility of the evidence. The first is that when Dr. Harry was asked to state the "manner" in which the turbulence caused the Tri-Pacer to break up, he was requested to base his opinion in part upon his previous opinion that turbulence had caused the failure. A similar objection is made to the question seeking Dr. Harry's opinion as to the angle at which the Tri-Pacer encountered the turbulence since it, too, was based on Dr. Harry's previous explanatory opinion of the manner in which the turbulence had caused the break up.
Plaintiffs cite no authority to sustain the proposition that an opinion of an expert witness may not properly be founded upon a prior opinion expressed by the same witness. In 2 Wigmore, Evidence, § 682, at p. 810 (3rd Ed. 1940) it is stated that there is no logical fatality in basing one expert opinion on another expert's opinion. This view is cited with apparent approval in Roberts v. United States, 316 F.2d 489, 496 (3rd Cir. 1963). If Professor Wigmore's view is accepted, it would follow by a fortiori reasoning that an expert should be permitted to give an opinion based upon an earlier opinion of his own. Even if Professor Wigmore's view is rejected, no reason suggests itself why an expert should not express an opinion based on his earlier opinion on a matter relevant to the second opinion.
The Government next contends that it was error for the Court to admit Dr. Harry's testimony that turbulence from another aircraft caused the failure of the Tri-Pacer, since, when that testimony was adduced, the angle of penetration was a "missing element".[1] The same might be said with respect to the altitudes at which the two airplanes were flying.
*523 The Government's position is this: Dr. Harry identified turbulence from another aircraft as the cause of the accident, without anything in the record, or before him by way of an assumption, to substantiate the fact that the flight paths of the two airplanes were at close to right angles when the turbulence was encountered or that both airplanes were flying at the same altitude. Then, having expressed the opinion that the failure of the Tri-Pacer was caused by turbulence from another aircraft, Dr. Harry testified on the basis of that opinion, that the flight paths of the two airplanes must have been close to right angles and that their altitude at the time of the accident must have been the same. The Government in effect claims that the testimony has the vice inherent in "arguing in a circle".
Despite the first blush plausibility of the Government's position, it is not acceptable. Dr. Harry expressed the opinion that aircraft turbulence was responsible for the crash, only after he had examined the damaged parts of the Tri-Pacer and had found that tension caused by negative (down) loads on the wings had brought about their failure. This was discernible from the parts themselves. He knew that aircraft turbulence could, under certain conditions, cause the tension breaks which the structure revealed. He also knew that other causes might have been responsible for the tension failure, i. e. meteorological turbulence, explosion or fire, mid-air collision, or lack of airworthiness. The possibility that any of these occurrences might have caused the accident was eliminated by the factual assumptions, supported by the record, which were stated to Dr. Harry.
Dr. Harry's testimony that aircraft turbulence caused the accident was admissible, even though there was nothing in the evidence or postulated concerning the flight paths or the altitudes of the airplanes. His testimony on the latter subjects simply amplified his opinion as to the cause of the accident, and explained the environmental conditions which must have existed when the Tri-Pacer failed.
Lastly, the Government asserts that in expressing the opinion that the turbulence from another aircraft caused the inflight failure, neither the question addressed to Dr. Harry nor his answer gave any indication of the weight, speed, or size of the "other aircraft". Dr. Harry stated that the energy content of a vortex would vary depending upon the type of aircraft involved and the conditions under which it was flying. The strength of the vortex, he said, depended primarily upon the weight of the aircraft, the wing span and the speed. (Tr. 1452-3, 1688-9). Despite the obvious importance of these factors, the fact that neither the questions nor the answers referred to them did not render the evidence inadmissible. Dr. Harry was familiar with the wing span (Tr. 1689-90), speed characteristics (Tr. 1581)[2], and weight (Tr. 1684, 1726) of a C-124 at the time when he identified the C-124 as the type of aircraft which could have caused the destruction of the Tri-Pacer by turbulence. It was not necessary to the validity of the hypothetical questions and answers for data concerning the speed, weight and wing span of the "other airplane" to have been incorporated in them. See Roberts v. United States, 316 F.2d 489, 493 (3rd Cir. 1963).
The objections advanced by the Government in its post-trial brief to Dr. Harry's testimony are without merit.
NOTES
[1] In September 1958 The Civil Aeronautics Authority was composed of the Civil Aeronautics Board (CAB) and the Office of the Administrator of Civil Aeronautics. The CAA, although largely independent, was within the Department of Commerce for budgeting and routine management functions. See 5 U.S.C.A. 133t (Reorganization Plan No. IV, Section 7), 5 and 6 U.S.C.A. at page 94. See also 49 U.S.C. § 1321(a) (1); 8 Am.Jur. 2d, Aviation § 10.
[2] Pre-trial order dated January 9, 1964, p. 3.
[3] This duty was specifically imposed upon the CAB within the CAA. However, it was delegable to the Administrator.
[4] The Federal Aviation Act of 1958 became effective after the accident. It invested the Administrator of the Federal Aviation Agency with virtually the same authority as had previously been conferred upon the CAB, 49 U.S.C. § 1421(a) (6). The existence of the CAB as a five man administrative board within the FAA was continued by the Federal Aviation Act of 1958, 49 U.S.C. § 1321(a) (1).
[5] "(c) The Civil Aeronautics Board, subject to such terms, conditions, and limitations as the Board may specify, is empowered to delegate to the Administrator the power or authority to prescribe rules, regulations, and standards under this subchapter * * *."
[6] Air Force Regulation No. 55-19, 13 July 1956 provided:

"1. The commander having jurisdiction ver local flying activities will: * * *
"(b) * * * When necessary, he will issue appropriate NOTAMS announcing that extensive training is being conducted within given vertical limits and that pilots entering the area(s) must use extreme caution."
[7] Although the District Court's decision was affirmed in Bartie v. United States, 326 F.2d 754 (5th Cir. 1964), the Court of Appeals refrained from passing on the § 2680(h) point.
[8] Jones and Hampton heard two explosions, Weber heard a "noise", Price heard no explosion or noise. Hampton testified that the airplane engine sputtered and then some seconds later came back on again and that this was immediately followed by an explosion and the airplane falling apart. Hampton said that at the time of the noise like an explosion, dark smoke came out of the pipe and the nose of the aircraft. A reading of Hampton's testimony will show its inherent limitations. (T. 1841-1871).
[9] Defendant's objections to Dr. Harry's testimony are the subject of a separate memorandum which deals with objections by both parties to rulings on evidence.
[10] The nature and effect of turbulence is discussed in detail in the memorandum dealing with the objections of the parties to the rulings on evidence.
[11] Murray was well qualified to testify. He was the owner of a public airport on Route 13 approximately 1 to 1½ miles north of Dover and the same distance from the Kenton VOR. He was familiar with the VOR, and had frequently used it in piloting his own plane. He held a private pilot's license and had been flying since 1924.
[12] Mr. Miller was also well qualified to testify. He obtained a pilot's license in 1938 for a private single-engine airplane and had about 200 hours flying time. During the war he flew as a flight engineer on B-24 and B-25 type aircraft and had about 800 flight hours on B-24s including 280 combat hours.
[13] The record fails to disclose the number of C-124s on scheduled or special missions which arrived at the Base on September 23, 1958.
[14] The fraction  52.9  results from the fact it represents a daily average.
[15] An "operation" was defined by Mr. Carmody of the CAB as a take-off or landing, (including a full stop, touch and go, and simulated missed approach) each take-off being counted as one operation and each landing being counted as another operation.
[16] The September 1958 figures include 66 Allegheny Airline operations at the Dover Base.
[17] The distances flown during the various phases of the approach maneuver are approximations based upon PX 10.
[18] If a "descending maneuver" were involved, clearance might be obtained to begin the approach at between 1500 and 2000 feet.
[19] The preamble of AFR 55-19 and par. 1, 1a, 1b and 5a read:

"OPERATIONS "Control of Local Air Force VFR Air Traffic
"PURPOSE: Safe and efficient Local Air Force flight operations today depend, in part, upon the manner in which local air traffic is supervised and controlled. This regulation provides guidance for commanders, pilots, and air traffic control personnel for insuring maximum safety and efficiency in their local flying operations.
"1. Establishing and Defining Local Flying Areas. The commander having jurisdiction over local flying activities will:
"a. Establish local flying area(s) within 100 miles of his base. He will locate the area(s), insofar as practicable, outside populous areas, control areas, and control zones to use the least congested airspace within the 100-mile limit. (When required, the commander of a major air command may authorize the extension of a local flying area beyond the 100-mile limit.)
"b. Define each local flying area by indicating prominent landmarks and/or radio fixes. When necessary, he will issue appropriate NOTAMS announcing that extensive training is being conducted within given vertical limits and that pilots entering the area(s) must use extreme caution. * * *
"5. Control of Simulated Instrument Flight Rule (IFR) Approaches. The commander, the pilot and air traffic control personnel are responsible as follows:
"a. The commander will direct maximum use of outlying facilities in order to relieve air traffic congestion near local navigational facilities."
[20] A consideration of the pertinence of paragraph 5b is not necessary for, as is later shown, the failure of the Commander to issue a NOTAM constituted negligence without regard to the terms of AFR 55-19.
[21] At the argument plaintiffs abandoned all other theories of pilot negligences. Transcript of argument April 17, 1964, pp. 13-15.
[22] It provides "5. How Close One Aircraft Will Be To Another. Aircraft will not be flown closer than 500 feet to any other aircraft in flight except when flown in authorized formation."
[23] This is the generally accepted definition of proximate cause applicable to negligence cases. 38 Am.Jur., Negligence, § 50, p. 695.
[24] In Cammer v. Atlantic Coast Line, 214 S.C. 71, 51 S.E.2d 174 (Sup.Ct.1948) which involved an injury at a railroad crossing, the Court held that if it were established that the railroad failed to comply with the requirement pertaining to crossing signals, it was negligent, and this "raised a rebuttable presumption that such delict was a proximate cause of the collision." (p. 177).
[25] Major Galloway testified (Tr. 1955) that in making a practice approach on the Kenton VOR when the C-124 made its inbound turn over the VOR from 200 degrees to 166 degrees its average speed was 140-145 knots; this is equal to 161-167 statutory miles per hour. (A knot is equal to one nautical mile per hour. To convert a nautical mile to a statutory mile the nautical mile must be multiplied by 1.50779). Galloway also stated that the outbound speed on the 20 degree leg of the Kenton VOR practice approaches averaged about 175 knots or 201 miles per hour.

Dr. Harry stated (Tr. 1740) that the characteristics of the generating aircraft portrayed in PX 68, the McGowan Technical Note, were the same as those of a C-124. The speed of the generating aircraft is given in the McGowan Note as 253 feet per second. This is 172 miles per hour. Dr. Harry also directly testified that the "approach speeds" of a C-124 are 150 to 170 miles per hour. (Tr. 581).
[26] In the instant case the decedent was not flying with traffic clearance.
[1] Government's Memorandum of Law on certain points of evidence, p. 9.
[2] Dr. Harry testified that he was familiar with the speed characteristics of the C-124. When pressed, he said he was familiar with them in an approach and on a takeoff, but that he was not familiar with them in low altitude procedures for practice instrument approaches. (Tr. 1581).